**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 19-60810-CIV-ALTMAN/Valle**

**ERIC WATKINS**,

     *Plaintiff,*

*v.*

**OFFICER DAVLIN SESSION**, *et al.*,

     *Defendants.*

_____/

**ORDER**

Eric Watkins was arrested for exposing his sexual organs in a city park. He says that he did no such thing and, claiming a long litany of constitutional violations, has sued the arresting officers, their police chief, the police department, and the city they work for.[1] The Defendants have moved to dismiss Watkins's Second Amended Complaint ("SAC"). This Order follows.

**THE FACTS**

On the morning of April 3, 2015, the Plaintiff, Eric Watkins, drove to a City of Lauderhill park, walked over to a dumpster area—which was "enclosed by shrubs as high as [his] stomach and higher"—and emptied a bottle of his urine onto the ground. SAC [ECF No. 91] ¶¶ 17–19. In doing so, Watkins says, he never displayed any part of his genitalia. *Id.* ¶ 20. And there were no other people in the park "as far as [he] could see." *Id.* ¶ 18. It wasn't until Watkins returned to his car that he saw one of the Defendants, Officer Davlin Session—who, Watkins tells us, was only then driving into the park. *Id.* ¶ 21.

Approximately twenty minutes after Officer Session entered the park, a second Defendant, Officer William Vogt, and a third (unnamed) officer arrived. *Id.* ¶ 23. Together, Officer Vogt and the

_____

[1] Collectively, the "Defendants."

unidentified officer approached Watkins. *Id.* Officer Vogt told Watkins that the Lauderhill Police Department had received a call that Watkins was using the park's dumpster area as a toilet and asked Watkins whether he had urinated there. *Id.* ¶ 23. When Watkins replied that he had merely emptied out a bottle of urine, Officer Vogt revealed that the police had been surveilling him for most of that morning. *Id.* ¶ 24. When pressed by Watkins, Officer Vogt admitted that the call the Police Department had received was anonymous. *Id.* ¶ 25. At some point in the interaction (Watkins does not say when), the officers noticed liquid on a wet piece of cardboard by the dumpster and took a sample. *Id.* ¶ 54.

Shortly afterwards, Officer Session joined the conversation and explained that he had seen Watkins urinate in the park, *id.* ¶ 26—at which point Officers Session and Vogt (together, the "Officers") arrested Watkins for violating Florida Statutes § 800.03, *id.* ¶ 26, which criminalizes "expos[ing] or exhibit[ing] one's sexual organs in public . . . in a vulgar or indecent manner, or [being] naked in public[.]" FLA STAT. § 800.03.

While handcuffed, Watkins insisted that no one could have seen him urinate in the park because (1) he had done no such thing and, (2) even if he had, he had been in the park alone that morning. SAC ¶ 27. Indeed, the first person Watkins saw in the park that day was Officer Session who—he maintains—only entered the park *after* he had disposed of his urine. *Id.*

Watkins alleges that his arrest is just the latest in a long-standing feud he has had with the Lauderhill Police Department. *Id.* ¶ 38. According to Watkins, Lauderhill's police officers consistently harass him by threatening to cite him for trespassing. *Id.* Watkins says that this ongoing harassment has impelled him to file several lawsuits against Lauderhill's police officers. *Id.* Indeed, Watkins claims that these specific Officers—Session and Vogt—have threatened and harassed him in the past. *Id.* And, Watkins avers, on the day of this arrest, Officer Session "reminded me that he was making good

on his threats to find a reason to arrest me." *Id.* ¶ 40. Watkins spent the night in jail and was released the next morning. *Id.* ¶ 46.

Watkins alleges that his arrest was humiliating. As he explains, "many people walking up and down the sidewalk outside the park" saw the Officers handcuff him and take him into custody. *Id.* ¶ 44. Watkins also says that, while he was in jail, his car was towed. *Id.* ¶ 43. Watkins adds that his arrest has caused him to worry about being designated as a sex offender. *Id.* ¶¶ 44–47. Finally, Watkins insists that, since his arrest, he has been "refused employment from numerous businesses because of the pending sex charge. Many employers would tell me that their insurance policy would not allow them to hire me with such pending charges. That I needed to get it disposed of first." *Id.* ¶ 52.

In his SAC, Watkins levies the following seven causes of action against the Officers: (1) false arrest (Count I); (2) fabricating evidence (Counts II and IV); (3) false imprisonment (Counts III and V); (4) malicious prosecution (Count VI); and (5) violations of the Fourteenth Amendment's Due Process Clause (Count VII). The SAC also asserts that Lauderhill's Chief of Police (Constance Stanley), the Lauderhill Police Department, and the City of Lauderhill violated 42 U.S.C. § 1983 by failing to follow their own policies (Count VIII).

The Defendants have filed a Motion to Dismiss (the "Motion") [ECF No. 92]. In it, they urge the Court: (1) to grant the Officers qualified immunity on Counts I, III, and V, because—they say— the Officers violated no "clearly established" law, Mot. at 3–7; (2) to dismiss Counts II, IV, and VI because Watkins has failed to allege that the Officers either lacked probable cause or else acted with malice, *id.* at 7–10; (3) to dismiss Count VII because, they argue, the Officers had probable cause and, in any case, because the claim arises more properly under the Fourth Amendment, *id.* at 10–11 n.4; (4) to dismiss the *Monell* claim—Count VIII—because Watkins has failed to allege any City policy or custom that caused the claimed violations, *id.* at 11–14; and (5) to dismiss the charge against Chief

Stanley (Count VIII) because Watkins has asserted no "failure to train" claim, *id.* at 15–16. For the reasons set out below, the Motion is **DENIED in part** and **GRANTED in part**.

**THE LAW**

On a motion to dismiss, the Court must accept the plaintiff's factual allegations as true, construing the complaint in the light most favorable to the plaintiff. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (citing *SEC v. ESM Grp., Inc.*, 835 F.2d 270, 272 (11th Cir. 1988)). Unsupported factual allegations and legal conclusions, however, receive no such deference. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

 "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (alteration added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted). Indeed, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556). To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (alteration added) (citing *Twombly*, 550 U.S. at 556). "The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss." *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009) (citation omitted), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012).

When, as here, the plaintiff is proceeding *pro se*, the Court must interpret the complaint liberally because *pro se* pleadings are held to "less stringent standards than those drafted by an attorney." *Sause v. Bauer*, 138 S. Ct. 2561, 2563 (2018). At the same time, the Court may not "serve as de facto counsel

4

or [] rewrite an otherwise deficient pleading in order to sustain an action." *Shuler v. Ingram & Assocs.*, 441 F. App'x 712, 716 n.3 (11th Cir. 2011).

**ANALYSIS**

### I.      Qualified Immunity

 "Qualified immunity protects government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Priester v. City of Riviera Beach*, 208 F.3d 919, 925 (11th Cir. 2000) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In this way, the defense of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

To qualify for the immunity, a government official must show that the challenged actions were committed within the scope of his discretionary authority. *See Kingsland v. City of Miami*, 382 F.3d 1220, 1232 (11th Cir. 2004) ("To receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." (internal citation omitted)). If he can do so, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).

To overcome the qualified-immunity defense, a plaintiff must demonstrate that the official deprived him of a constitutional right that was "clearly established" when the alleged offense occurred. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). This requirement "ensure[s] that before they are subjected to suit, officers are on notice their conduct is unlawful." *Id.* at 206. "Put another way, the defendant must have fair notice of his conduct's unconstitutionality which derives from one of the following sources: (1) the obvious clarity of constitutional or statutory language; (2) broad holdings or statements

of principle in case law that are not tied to particularized facts; or (3) fact-specific judicial precedents that are not fairly distinguishable." *Eloy v. Guillot*, 289 F. App'x 339, 346 (11th Cir. 2008) (citing *Vinyard v. Wilson*, 311 F.3d 1340, 1350–52 (11th Cir. 2002)). For purposes of qualified immunity in this District, only decisions of the United States Supreme Court, the Eleventh Circuit Court of Appeals, and the Florida Supreme Court constitute "clearly established" law. *See McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007) ("We have held that decisions of the United States Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state (here, the Supreme Court of Florida) can clearly establish the law."). In sum, "[q]ualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Hope v. Pelzer*, 536 U.S. 730, 752 (2002) (internal quotation marks omitted).

The Defendants assert qualified immunity only as to the claims of false arrest (Count I) and false imprisonment (Counts III and V). *See* Mot. at 7; *cf.* SAC ¶¶ 9, 11, 13.

### A.    Discretionary Function

As a preliminary matter, Watkins never argues that the Officers were acting other than in their discretionary functions when they arrested him. *See generally* Response to Motion to Dismiss ("Response") [ECF No. 93]. He has thus waived any such argument. *See, e.g., Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived."); *Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009) ("A party cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions.").

Either way, the Officers' conduct fell squarely within the ambit of their discretionary functions. In deciding whether an act is part of an officer's discretionary function, courts ask whether the act

falls within the officer's general job duties. *See Hollomon ex rel. Hollomon v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004) ("Instead of focusing on whether the acts in question involved the exercise of actual discretion, we assess whether they are of a type that fell within the employee's job responsibilities."). "Our inquiry is two-fold. We ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Id.* And, not surprisingly, the acts of arresting and imprisoning a subject are well within the scope of a police officer's discretionary function. *See Sevostiyanova v. Cobb Cty.*, 484 F. App'x 355, 357 (11th Cir. 2012) ("A police officer acts within his discretionary authority when he effectuates an arrest.").

B.    **Clearly Established Law**

This conclusion—that the Officers were acting within their discretionary functions when they arrested Watkins—shifts onto Watkins the burden of showing that the Officers are *not* entitled to qualified immunity. *See Holloman*, 370 F.3d at 1264 ("If, interpreting the evidence in the light most favorable to the plaintiff, the court concludes that the defendant was engaged in a discretionary function, then the burden shifts to the plaintiff to show that the defendant is *not* entitled to qualified immunity."). To satisfy this burden, Watkins must show that the Officers violated some constitutional right that was "clearly established" at the time of his arrest. *Saucier*, 533 U.S. at 201.

"[I]t is well established that an arrest without probable cause is an unreasonable seizure that violates the Fourth Amendment." *Grider v. City of Auburn*, 618 F.3d 1240, 1256 (11th Cir. 2010). An officer thus enjoys qualified immunity against a false-arrest claim *only* if he had "arguable probable cause" to make the arrest. *See Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993) (holding that officer was entitled to qualified immunity because he had "arguable probable cause" to arrest plaintiff who kept talking after being instructed to keep quiet, because that noncompliance indicated that the plaintiff "was interfering or was about to attempt to interfere" with the police). An officer has

"arguable probable cause" when a "reasonable officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well-established law." *Gold v. City of Miami*, 121 F.3d 1442, 1445 (11th Cir. 1997). "The existence of arguable probable cause depends on the elements of the alleged crime and the operative fact pattern." *Longino v. Henry Cty.*, 719 F. App'x 828, 832 (11th Cir. 2019) (cleaned up)). Whether an officer had "arguable probable cause" depends on the totality of the circumstances. *Cozzi v. City of Birmingham*, 892 F.3d 1288, 1294 (11th Cir. 2018) (citing *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018)). Lastly, "an officer's underlying intent or motivation' is irrelevant" to the "arguable probable cause" analysis. *Id.* (quoting *Lee*, 284 F.3d at 1195).

### 1.   § 800.03 Criminalizes Only Lewd and Lascivious Conduct

Watkins was arrested for exposing his sexual organs in a public park, in violation of Florida Statutes § 800.03, a first-degree misdemeanor. *See* SAC ¶¶ 26, 32. In pertinent part, that statute makes it unlawful to "expose one's sexual organs in public . . . . in a vulgar or indecent manner, or to be naked in public except in any place provided or set apart for that purpose." FLA. STAT. § 800.03. The statute thus criminalizes *either* (1) exposing one's sexual organs in a vulgar *or* indecent manner *or* (2) being naked in a public place.

Now, one might justifiably suppose that the act of urinating in public is both vulgar and indecent. "Vulgar," after all, means "lacking in cultivation, perception or taste"; "morally crude, undeveloped or unregenerate"; or even "ostentatious or excessive in expenditure or display." *Vulgar*, *Merriam-Webster Unabridged*, https://www.merriam-webster.com/dictionary/vulgar (last visited Feb. 18, 2021). And "indecent" means "grossly improper or offensive" and "unseemly or inappropriate." *Indecent*, *Merriam-Webster Unabridged*, https://www.merriam-webster.com/dictionary/indecent (last visited Feb. 18, 2021). Under either definition, urinating in a space reserved for the public would seem to qualify. But that is not the end of the matter. *See S. Fla. Free Beaches, Inc. v. City of Miami*, 734 F.2d

608, 611 (11th Cir. 1984) ("The Supreme Court of Florida limited the reach of FLA. STAT. § 800.03 in *Hoffman v. Carson,* 250 So. 2d 891, 894 (Fla. 1971). The statute does not prohibit all nudity.").

In a decision this Court does not here ratify, the Florida Supreme Court came up with its own definitions for the words "vulgar" and "indecent." *See Hoffman v. Carson*, 250 So. 2d 891 (Fla. 1971). In *Hoffman*, a "go-go" dancer—having been arrested for "going totally nude and exposing her sex organs in the course of her performances at a Jacksonville cocktail lounge"—contended that § 800.03 was unconstitutional because the words "vulgar" and "indecent" were too vague to give her fair warning of the kinds of conduct the statute proscribed. *Id.* at 893. The Florida Supreme Court disagreed. "Because of the nature of the statute," the court explained, "the terms in question must be construed as necessarily relating to a lascivious exhibition of those private parts of a person which common propriety requires to be customarily kept covered in the presence of others." *Id.* "This construction," the court continued, "necessarily applies also to the language, 'or so to expose or exhibit his person in such place, or to go or be naked in such place.'" *Id.* In saying so, the court interpreted the statute as applying only to the lascivious—viz., sexual—exhibition of one's "private parts," and then applied this lasciviousness limitation to both prongs of the statute: the "exposure" prong *as well as the* "naked in public" prong.[2]

---

[2] That same year, the Florida Supreme Court clarified that the term "lascivious" means an "unlawful indulgence in lust, eager for sexual indulgence." *Chesebrough v. State*, 255 So. 2d 675, 677 (Fla. 1971); *see also id.* ("The words 'lewd' and 'lascivious' behavior when used in a statute to define an offense has been held to have the same meaning, that is, an unlawful indulgence in lust, eager for sexual indulgence."). This interpretation has remained unchanged to this day. *See Schmitt v. State*, 590 So. 2d 404, 410 (Fla. 1991) ("Under Florida criminal law, the terms 'lewd' and 'lascivious' are synonymous: Both require an intentional act of sexual indulgence or public indecency, when such act causes offense to one or more persons viewing it or otherwise intrudes upon the rights of others."); *cf.* Fla. Std. Jury Instr. (Crim.) 11.9 (defining the elements of § 800.03 as including "3. [Defendant] intended the [exposure or exhibition of [his] [her] sexual organs] [or] [nakedness] to be in a vulgar, indecent, lewd, or lascivious manner. 4. The [exposure or exhibition of the sexual organs] [or] [nakedness] was in a vulgar, indecent, lewd, or lascivious manner").

*Hoffman*'s reasoning is deeply flawed. The plain meaning of the words in § 800.03 is clear and unmistakable—and that should have been the end of the matter. *See* A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 69 (2012) ("The ordinary-meaning rule is the most fundamental semantic rule of interpretation."); *see id.* at 94 ("Nothing is to be added to what the text states or reasonably implies."). But, even were it necessary to define the words of § 800.03 by reference to other, extraneous words, it's not clear why the Florida Supreme Court chose the word "lascivious"—which isn't synonymous with either "vulgar" or "indecent"—as its guidepost. Unlike the words "vulgar" or "indecent," the word "lascivious" necessarily includes "sexual desire." *See Lascivious, Merriam-Webster Unabridged*, https://www.merriam-webster.com/dictionary/lascivious (last visited Feb. 18, 2021) (defining "lascivious" as "filled with or showing sexual desire"). And why would the court apply the lasciviousness restriction to *both* "vulgar" and "indecent?" After all, even if "vulgar" means "lascivious," there's no reason to believe that "indecent" does, too. *See* SCALIA & GARNER at 174 ("If possible, every word and every provision is to be given effect . . . . None should be ignored. None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence.").

Worse, by magically transporting the word "lascivious" to every part of the sentence, the court's construction ignores the disjunctive composition of the statute. The court never explains why (or how) its superimposed adjective ("lascivious") should travel across the statute's second disjunctive and modify its final phrase ("or to go or be naked in such place"). *See id.* at 152 ("When the syntax involves something other than a parallel series of nouns or verbs, a prepositive or postpositive modifier normally applies only to the nearest reasonable referent."). *Hoffman* thus violates several statutory canons simultaneously by ignoring the plain meaning of unambiguous words, rendering certain words superfluous, importing other—different—words that never appear in the statute, and then deploying its contrived definition to modify far-off phrases. Nevertheless, the Florida Supreme

Court is the ultimate authority on Florida law, and "we do not sit to question its interpretation of that State's statutes." *Ford v. Strickland*, 696 F.2d 804, 819 (11th Cir. 1983).

The law is thus "clearly established" that § 800.03 "necessarily" prohibits only lewd or lascivious conduct. Indeed, *every* Florida District Court of Appeal that has addressed this question has (1) interpreted *Hoffman* to mean that § 800.03 requires some lascivious—that is, sexual—conduct; and (2) concluded that the act of urinating in a public park, without more, does not violate § 800.03. *See Duvallon v. State*, 404 So. 2d 196, 197 (Fla. 1st DCA 1981) ("The Florida Supreme Court has recognized that the term 'vulgar or indecent manner' must be construed as necessarily relating to a lascivious exhibition of those private parts of a person which common propriety requires to be customarily kept covered in the presence of others. Lascivious means that the exposure or exhibition must be 'lewd' involving 'an unlawful indulgence in lust, eager for sexual indulgence. . . . Florida signals its intent that there be intentional conduct by use of the term 'in a vulgar or indecent manner.'"); *Goodmakers v. State*, 450 So. 2d 888, 891 (Fla. 2d DCA 1984) ("Hence, in order for there to be a violation of section 800.03, there must be, coupled with mere nudity, 'lascivious' exposition or exhibition of the defendant's sexual organs."); *Payne v. State*, 463 So. 2d 271, 271 (Fla. 2d DCA 1984) ("We held that in order for there to be a violation of section 800.03 there must be a lascivious exposure of a sexual organ. This means that the perpetrator's exposition or exhibition involves 'an unlawful indulgence in lust, eager for sexual indulgence.'" (quoting *Chesebrough*, 255 So. 2d at 677); *Beckham v. State*, 934 So. 2d 681, 685 (Fla. 2d DCA 2006) (partial exposure of defendant's buttocks "would not justify any suspicion of lewd or lascivious behavior"); *Usry v. State*, 118 So. 3d 988, 990 (Fla. 1st DCA 2013) ("[S]ection 800.03 requires a sexual intent as opposed to an 'obnoxious intent.'"); *see also Miller v. Barberton Mun. Court*, 935 F.2d 775, 778 (6th Cir. 1991) ("The Florida statute [§ 800.03] provided, unlike the Ohio statute, that public nudity could only be prosecuted if the act was lewd or lascivious.").

11

Trying to distinguish *Hoffman*, the Officers argue that "*Hoffman* . . . does not present similar circumstances, particularized to the allegations here, where an officer is alleged to have violated the Fourth Amendment." Mot. at 6–7. In other words, they say, *Hoffman* failed to give them fair warning that public urination doesn't violate § 800.03. *Id.*

But *Hoffman* didn't limit itself to its facts. As we've discussed, *Hoffman* held that, "[b]ecause of the nature of the statute, the terms in question must be construed as *necessarily* relating to a lascivious exhibition[.]" *Hoffman*, 250 So. 2d at 893 (emphasis added). *Hoffman* thus created a blanket rule: § 800.03 prohibits only "lascivious exhibition." It's true, of course, that *dicta*—even *dicta* from the Florida Supreme Court—doesn't necessarily establish (let alone "clearly establish") anything. *See Santamorena v. Ga. Military Coll.*, 147 F.3d 1337, 1342 n.13 (11th Cir. 1998) ("We have already stated that '[t]he law cannot be established by dicta. Dicta is particularly unhelpful in qualified immunity cases where we seek to identify clearly established law." (quoting *Hamilton v. Cannon*, 80 F.3d 1525, 1530 (11th Cir. 1996)). But *Hoffman*'s rule was integral to its holding. After all, in rejecting the void-for-vagueness challenge, *Hoffman* determined that § 800.03 "necessarily" prohibited *only* lascivious conduct. *Hoffman*, So. 2d at 893. So circumscribed, *Hoffman* concluded, there was nothing vague about § 800.03. That's why, since *Hoffman*, the Florida Supreme Court's Standard Jury Instructions for violations of § 800.03 require (among other things) proof that "[the Defendant] intended the [exposure or exhibition of [his] [her] sexual organs] [or] [nakedness] to be in a vulgar, indecent, lewd, or lascivious manner." Fla. Std. Jury Instr. (Crim.) 11.9; *see also Duvallon*, 404 So. 2d at 197 ("This is in accord with the general rule that statutes dealing with crimes of moral turpitude generally require proof of intent as an essential element. Florida signals its intent that there be intentional conduct by use of the term 'in a vulgar or indecent manner."); *Usry*, 118 So. 3d at 990 ("[S]ection 800.03 requires a sexual intent as opposed to an 'obnoxious intent."). And so, while *Hoffman* didn't "clearly establish" whether public urination constitutes a violation of § 800.03, it *did* "clearly establish" that § 800.03 requires some

"lascivious" conduct—which, in turn, means that a defendant doesn't violate § 800.03 unless he exposes himself with the intent to do something *sexual*. The question we must answer here, then, is whether the Officers had "arguable probable cause" to believe that, by urinating in the park, Watkins intended to do something sexual.

### 2.    Arguable Probable Cause

"The existence of arguable probable cause depends on the elements of the alleged crime and the operative fact pattern." *Longino*, 719 F. App'x at 832 (cleaned up). At the same time, "[s]howing arguable probable cause does not . . . require proving every element of a crime." *Brown v. City of Huntsville*, 608 F.3d 724, 735 (11th Cir. 2010); *see also Gates v. Khokhar*, 884 F.3d 1290, 1300 (11th Cir. 2018) ("To require an arresting officer to prove every element of a crime would negate the concept of probable cause and transform arresting officers into prosecutors." (cleaned up)).

It's worth noting that, for years, judges have struggled to define the contours of "arguable probable cause." *See Walczyk v. Rio*, 496 F.3d 139, 168 (2d Cir. 2007) (Sotomayor, J., concurring) ("It is not surprising, then, that 'arguable probable cause' finds no mention in any Supreme Court opinion; the need for a separate term to describe this concept arises only once we have improperly splintered the 'clearly established' inquiry. Because I believe 'arguable probable cause' is both imprecise and an outgrowth of the first flaw in our qualified immunity analysis, I do not agree with the majority's use of the term."); *Fils v. City of Aventura*, 768 F. Supp. 2d 1188, 1202 (S.D. Fla. 2010) ("If he did not [have probable cause], the court reaches *Saucier* step two to decide whether the illegal arrest was nevertheless excusable because the officer had "arguable probable cause"—*i.e.*, because no pre-existing law clearly put the arresting officer on notice that his conduct was unconstitutional."), *aff'd in part and rev'd in part on other grounds*, 647 F.3d 1272 (11th Cir. 2011). Whatever "arguable probable cause" means, though, everyone agrees that it must mean *something*. That is to say, the quantum of evidence an officer adduces must, however lax the standard, *arguably* amount to probable cause. What "arguable probable cause"

cannot mean, then—what no court has ever suggested it could mean—is *nothing*: no evidence nor even *the possibility* of producing evidence with respect to one of a crime's various elements.

And that's precisely what we have here. The Officers go to great lengths to show that venery isn't an element of a § 800.03 violation: they splice the statutory language; distinguish *Hoffman*; and carp about the degree of notice they were given. *See* Mot. at 5–7. But they *never* suggest that, even *if* venery *were* an element of § 800.03, they would have had "arguable probable cause" with respect to that element. *See id.* And that's because they seem to concede—as, indeed, they must—that, *if* venery is an element of § 800.03, then there's no set of facts under which they *could have had* probable cause with respect to that element because there's nothing about urinating in public that's innately sexual. *See Tatt v. Atlanta Gas Light Co.*, 138 F. App'x 145, 148 (11th Cir. 2005) ("Donaldson's acts [feigning urination] were not sexual in nature: they do not become sexual in nature merely because they relate to a bodily function."); *E.E.O.C. v. CRST Van Expedited, Inc.*, 611 F. Supp. 2d 918, 947 n.12 (N.D. Iowa 2009) ("[U]rination is not 'clearly sexual in nature' and lacks 'explicit sexual overtones.'" (internal citations omitted)). By failing to advance *any* argument for the proposition that, if lasciviousness were an element of § 800.03, they would have had probable cause for that element, the Officers have waived the point. *See, e.g.*, *Hamilton*, 680 F.3d at 1319 ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *In re Egidi*, 571 F.3d at 1163 ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived.").

Now, the Officers could have argued that they should be enshrouded in qualified immunity and absolved from suit because they made a reasonable mistake of *law*. Qualified immunity, after all, "applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 555 U.S. at 231 (2009) (cleaned up). To deserve qualified immunity, though, the Officers would have had to show that their mistake of law was reasonable. *See, e.g.*, *Eves v. LePage*, 927 F.3d 575, 588 (1st Cir. 2019) ("[A] reasonable mistake of

law does not defeat qualified immunity."); *Southerland v. Pennsylvania*, 389 F. App'x 166, 172 (3d Cir.
2010) ("We protect reasonable mistakes of law because it is sometimes difficult for an officer to
determine how the relevant legal doctrine will apply to the factual situation the officer confronts."
(cleaned up)); *cf. Heien v. North Carolina*, 574 U.S. 54, 66 (2014) ("The Fourth Amendment tolerates
only *reasonable* mistakes, and those mistakes—whether of fact or law—must be *objectively* reasonable.").
As the Supreme Court has explained, "[q]ualified immunity gives government officials breathing room
to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S.
731, 744 (2011). But, since the Officers never make this argument—indeed, because they never even
address the reasonable-mistake-of-law doctrine, *see* Mot. at 5–7—the Court need not delve into this
question here, *see, e.g.*, *In re Egidi*, 571 F.3d at 1163.

There are (it's true) other arguments the Officers could have advanced here. Some of these,
in fact, were raised in the Officers' Motion for Summary Judgment ("MSJ") [ECF No. 159], which
the Court has denied without prejudice, *see* Paperless Order [ECF No. 180]. In that MSJ, for instance,
the Officers claimed, for the first time, that they *did* have evidence of lewd or lascivious intent and
that, in any event, they intend to rely on a different doctrine—the "any crime exception." MSJ at 7; *see
also Manners v. Cannella*, 891 F.3d 959, 969 (11th Cir. 2018) ("Probable cause for an arrest may be found
if there is probable cause to believe any crime was committed, whether or not there is probable cause
for the crime the arresting officer actually believed had been committed."). But, because the Officers
never made these arguments in their Motion, the Court need not consider them here. Suffice it to say
that, since Watkins will be permitted to amend his SAC (q.v. our discussion on the SAC's many
deficiencies), the Officers will get another chance to attack the (impending) third-amended complaint.
And, in that next attack, the Officers may—though they need not—advance these *other* arguments for

qualified immunity. Until then, though, the Officers' Motion to Dismiss Counts I, III, and V is

**DENIED**.[3]

## II.    The Merits

We turn, then, to the merits of Watkins's claims. As a preliminary matter, though, we note that the Officers never challenge Watkins's false-arrest and false-imprisonment claims—Counts I, III, and V—on the merits. *See generally* Motion. We thus review the merits only of the remaining claims.

## A.    Fabrication of Evidence (Counts II and IV)

In Count II, Watkins alleges that Officer Session lied when he attested, in a probable-cause affidavit, that he had seen Watkins urinate in the park. SAC ¶ 10.[4] In Count IV, Watkins says that

---

[3] The Court thus need not address—at least not today—Watkins's separate contention that the Officers lacked probable cause to believe he'd done *anything* wrong. *See* Response to Motion for Summary Judgment [ECF No. 169] at 11. When the issue does come up, it won't be an easy call. According to the SAC, an anonymous caller reported that someone was urinating in the park, SAC ¶ 24; Watkins was the only person in the park when the Officers arrived, *id.* ¶ 28; and, when the Officers approached Watkins, they found him near a cardboard box covered in a liquid that Watkins admits was urine, *id.* ¶¶ 19, 54. It is, of course, well-settled that an anonymous call, without more, does not give rise to probable cause. *See Cozzi*, 892 F.3d at 1295 ("Tips may contribute to a probable cause determination, but in assigning probative weight to such tips, courts must assess the totality of the circumstances surrounding them, including the tips' reliability."). But anonymous tips may bear other indicia of reliability. As relevant here, anonymous tips may, for instance, be corroborated by other evidence—which, taken together, may give rise to probable cause. *See Craig v. Singletary*, 127 F.3d 1030, 1046 (11th Cir. 1997) ("An anonymous tip does not, of itself, satisfy probable cause requirements, but it is information that may be considered if corroborated." (internal citations omitted)). And, as noted, the Officers arguably corroborated the anonymous caller's account of a man urinating in a park by finding Watkins alone in the park beside a cardboard box that appeared to be covered in urine. *See* SAC ¶¶ 28, 54. But, again, these are questions we leave for another day.

[4] In full, Count II reads as follows: "It is Plaintiff's Complaint that on April 3, 2015 defendant Davlin Session did willfully, intentionally and with malicious intensions did violate my Fourth Amendment right not to be maliciously prosecuted when he initiated a malicious prosecution against me by falsifying probable cause—that is falsely claiming that he witnessed me taking out my penis and urinate in the park—he's a liar! I never took out my penis and urinate in the park and the defendant never saw me urinate in the park nor take out my penis. The defendant filed the probable cause affidavit against me and other supporting documents and was awaiting trial to testify against me in the criminal case." SAC ¶ 10 (errors in original).

Officer Vogt lied when he declared, in his probable-cause affidavit, that Watkins confessed to urinating in the park. *Id.* ¶ 12.[5]

A word about characterizing these claims. Watkins suggests that these counts sound in *both* malicious prosecution *and* fabrication of evidence. *See id.* ¶¶ 10, 12. For our purposes, though, the distinction doesn't matter much because, in the Eleventh Circuit, a fabrication-of-evidence claim is really just a species of malicious prosecution.[6] Put differently, in this Circuit, the right a fabrication-of-evidence claim vindicates is the right not to be prosecuted with fabricated evidence. *See, e.g.*, *Kingsland*, 382 F.2d at 1234 ("Kingsland also asserts a § 1983 claim for malicious prosecution based on the defendants' alleged fabrication of evidence against her[.]"); *Johnson v. Darnell*, 781 F. App'x 961, 964 (11th Cir. 2019) ("As to Johnson's claim for malicious prosecution, he failed to allege facts that

---

[5] That Count asserts the following: "It is Plaintiff's Complaint that on April 3, 2015 defendant William Vogt did willfully and intensionally and with malicious intensions did violate my Fourth Amendment right not be maliciously prosecuted when he initiated a malicious prosecution against me by Falsifying probable cause—that is, Falsely claiming that 'I stated to him that I had urinated in the park and thought I could do so.' This is a lie. I did not make this statement, supra, to the defendant Vogt. Defendant Vogt filed a probable cause affidavit against me with other supporting documents in support of his false claim and he was awaiting trial to testify against me in the criminal case. This prosecution was also malicious because case law and the statute had long made clear that mere urinating in public did not violate FS.800.03." *Id.* ¶ 12 (errors in original).

[6] Even if fabrication of evidence were a separate claim, however, Counts II and IV would still be dismissed because they lack a crucial element: legal process. In a recent decision, the Supreme Court "assume[d] without deciding" that a § 1983 plaintiff's fabrication-of-evidence and malicious-prosecution claims were distinct. *See McDonough v. Smith*, 139 S. Ct. 2149, 2155 (2019). Still, in deciding the question there presented—when did the statute of limitations on the plaintiff's fabrication-of-evidence claim accrue?—the Court concluded that "malicious prosecution is the most analogous common-law tort here." *Id.* at 2156. The Court thus applied the accrual rule that traditionally governs claims of malicious prosecution—the termination of the criminal proceedings—to the plaintiff's fabrication-of-evidence claim. In doing so, however, the Court refused "to opine on what the elements of a constitutional malicious prosecution action under § 1983 are or how they may or may not differ from those of a fabricated-evidence claim." *Id.* at 2156 & n.3. The Court did, however—and this is crucial for our purposes—define *one* element that both a fabrication-of-evidence and a malicious-prosecution claim have in common: "at bottom, both claims challenge the integrity of criminal prosecutions undertaken '*pursuant to legal process.*'" *Id.* at 2156 (citing *Heck v. Humphrey*, 512 U.S. 477, 484 (1994) (emphasis added)). Since Watkins never alleges that the Officers' actions were "undertaken pursuant to legal process," his claims—whether they're treated as one cause of action or two—must be dismissed.

would plausibly suggest Cruz or Pino-Diaz were the legal cause of the proceeding against him. Specifically, as noted above, he failed to allege any facts concerning the substance of the evidence or statements Cruz or Pino-Diaz fabricated."); *Williams v. Miami-Dade Police Dep't*, 297 F. App'x 941, 947 (11th Cir. 2008) ("Williams's malicious prosecution claim against Baaske is based upon Baaske's alleged act of fabricating evidence, which resulted in the prosecutor being presented with false and misleading evidence."). For their part, the Officers treat Counts II and IV as malicious-prosecution claims, *see* Mot. at 7, and Watkins doesn't dispute this characterization,[7] *see generally* Response. Far from it: in the SAC, in fact, he describes these claims with the words "malicious prosecution." SAC ¶¶ 10, 12.[8] The Court thus construes Counts II and IV as asserting claims of malicious prosecution.

"To establish a federal malicious prosecution claim under § 1983, the plaintiff must prove a violation of his Fourth Amendment right to be free from unreasonable seizures in addition to the elements of the common law tort of malicious prosecution." *Wood v. Kesler*, 323 F.3d 872, 881 (11th Cir. 2003). "Under the common-law elements of malicious prosecution, [the plaintiff] must prove that the officers 'instituted or continued' a criminal prosecution against him, 'with malice and without probable cause,' that terminated in his favor and caused damage to him." *Williams v. Aguirre*, 965 F.3d 1147, 1157 (11th Cir. 2020). Unlike a claim of false arrest or false imprisonment, though, a plaintiff asserting a malicious-prosecution claim must show "a seizure pursuant to legal process." *Id.* at 1158 (citing *Black v. Wigington*, 811 F.3d 1259, 1267 (11th Cir. 2016)); *see also id.* ("A claim of false arrest or imprisonment under the Fourth Amendment concerns seizures without legal process, such as

---

[7] By comparison, Watkins *does* dispute the Defendants' characterization of Count VIII as a failure-to-train claim. *See* Response at 2 (arguing that Count VIII "should not be construe [sic] as a failure to train but as is stated a failure to follow policy").

[8] Watkins, though *pro se*, is an experienced litigant who, over the past 12 years, has filed a staggering 80 federal lawsuits, including 36 in this District. *See Watkins v. Dubreuil*, 820 F. App'x 940, 946 (11th Cir. 2020). This figure (notably) does not include the 400 complaints he filed during his prior incarceration. *Id.*

warrantless arrests."). A seizure "pursuant to legal process" includes a warrant-based seizure, or, in the case of a warrantless arrest, a "seizure following an arraignment, indictment, or probable cause hearing." *Id.*

Watkins, however, never alleges that he was seized "following an arraignment, indictment, or probable cause hearing." SAC ¶¶ 26, 43–46. To the contrary, he says only that he was arrested on April 3, 2015, *id.* ¶ 17, and released the next day, *id.* ¶ 46. The viability of Counts II and IV thus turns on whether Watkins was arrested pursuant to a warrant. But, again, Watkins never says that the Officers had a warrant for his arrest. *See generally id.* And his claim that the Officers filed "probable cause affidavits," *id.* ¶ 10, 12, doesn't qualify, *see Love v. Oliver*, 450 F. Supp. 2d 1336, 1342 (N. D. Ga. 2006) (holding that "warrantless arrest probable cause affidavits" are not "legal process" for purposes of a malicious-prosecution claim).[9]

In sum, the Defendants' Motion to Dismiss Counts II and IV is **GRANTED**.

## B.    Count VI: Malicious Prosecution (Redux)

The Officers also move to dismiss Count VI, which alleges that "Davlin Session and William Vogt . . . did willfully and intensionally [sic] violate Plaintiff's Fourth Amendment not to be maliciously prosecuted and to be free from restraint and imprisonment when they both arrested Plaintiff[.]" SAC ¶ 14. This claim is susceptible of at least two interpretations—neither viable. If, on the one hand, it's simply duplicative of the false-arrest and false-imprisonment claims Watkins asserts in Counts I, III, and V, it must be dismissed. *See Harrison v Digital Health Plan*, 183 F.3d 1235, 1237 (11th Cir. 1999) ("We find no error in the district court's . . . dismissal of plaintiff's claim . . . as duplicative[.]"); *Trief v. AM. Gen. Life Ins. Co.*, 444 F. Supp. 2d 1268, 1270 (S.D. Fla. 2006) ("[I]t appears Plaintiff's allegations

---

[9] Watkins, in fact, appears to agree that the Officers effectuated a *warrantless* arrest—that is, an arrest without "legal process." *See* Response at 3 (alleging that "the facts of Plaintiff's complaint shows that the officers [sic] warrantless arrest of Plaintiff was without probable cause"). Of course, since this allegation doesn't appear in the SAC, the Court will not consider it here.

in count II amount to nothing more than a general allegation for breach of contract and are therefore duplicative of count III. Accordingly, the Court finds that count II must be dismissed." (internal citations omitted)). On the other hand, if Count VI is a separate species of malicious-prosecution claim—viz., a malicious-prosecution claim stemming from Watkins's incarceration, rather than from the Officers' probable-cause affidavits—it's deficient in the same way, and for the same reason, as Counts II and IV. Which is to say that Watkins cannot sustain a malicious-prosecution claim unless he properly alleges that he was seized and held pursuant to some legal process. *See Williams*, 965 F.3d at 1158. And, again, the Officers' probable-cause affidavits don't qualify. *See Love*, 450 F. Supp. 2d at 1342.

The Defendants' Motion to Dismiss Count VI is therefore **GRANTED**.

### C.      Count VII: Due Process

In Count VII, Watkins alleges that the Officers deprived him of his right under the Due Process Clause of the Fourteenth Amendment to patronize the park in which he was arrested. *See* SAC ¶ 15. Here, again, Watkins fails to state a plausible claim to relief.

While Watkins has "a constitutionally protect liberty interest to be in parks or on city lands of [his] choosing that are open to the public generally," this liberty interest may be forfeited "by trespass or other violation of law." *Catron v. City of St. Petersburg*, 658 F.3d 1260, 1266 (11th Cir. 2011). In *Catron*, the plaintiffs argued that the City of St. Petersburg had deprived them of their liberty interest in patronizing a public park by "enforcing the trespass ordinance to prohibit them from having access to a specific park" and by "carrying out a policy of enforcing the ordinance to prohibit their use of all parks in the City open to the public generally." 658 F.3d at 1266–67. Unlike the *Catron* Plaintiff, however, Watkins has not explained how the Officers' actions—wrongful though they may have

been—infringed on his ability to patronize the park. The SAC never says, for instance, that, after Watkins's arrest, the Officers somehow prevented him from returning to that park.[10]

The Defendants' Motion to Dismiss Count VII is therefore **GRANTED**.

### D.      Count VIII: *Monell*

In Count VIII, Watkins alleges that Chief Constance Stanley, the Lauderhill Police Department, and the City of Lauderhill failed to "follow [their] policy to issue a memorandum" of relevant court decisions interpreting Fla. Stat. § 800.03. *See* SAC ¶ 16. Specifically, Watkins says that, under Lauderhill Police Department Policy 74.300(D), the police department must "periodically issue memorandums or court decisions which affects [sic] the officer's conduct in arrest situations." *Id.* ¶ 61. According to Watkins, "the Lauderhill Police Department, Constance Stanley, and the City of Lauderhill was required to inform its officers of the holdings and decisions in those cases [referring to *Hoffman*, *Chesebrough*, and *Payne*]." *Id.* ¶ 66. Had they done so, Watkins avers, the defendants "would have never violate [sic] plaintiff's constitutional rights." *Id.* ¶ 67.

"[T]he Supreme Court has placed strict limitations on municipal liability under § 1983." *Grech v. Clayton Cty.*, 335 F.3d 1326, 1329 (11th Cir. 2003). A municipality can be liable under § 1983 only when "the municipality itself causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). To state a viable claim of municipal liability, therefore, Watkins must identify a "municipal policy or custom that caused his injury." *Grech*, 335 F.3d at 1329. And "it is only when the execution of the government's policy or custom inflicts the injury that the municipality may be liable

---

[10] In his Response to the Motion to Dismiss, Watkins clarifies that, between his arrest and his dismissal, a Florida *state-court judge* ordered him not to return to the park. *See* Response at 12. But, since this fact doesn't appear in the SAC, the Court will not consider it here. *See W. Surety Co. v. Steuerwald*, 2017 WL 52484499, at *3 (S.D. Fla. Jan. 17, 2017) ("[A] Response to a Motion to Dismiss is not properly used as an attempt to add additional claims or allegations."). Either way, even this averment—that a state court ordered Watkins not to enter the park—seems to have little to do with the *Officers* who (after all) are the Defendants here.

under § 1983." *Gold*, 151 F.3d at 1350 (citing *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (cleaned up)).

Even taking the SAC's facts as true—viz., that the Lauderhill Police Department had a policy of issuing instructional memos and, for whatever reason, did not do so here—Watkins has, for two reasons, failed to state a plausible claim to relief as to the City. *First*, a municipality is liable under § 1983 only when it "implements or executes" a policy or custom that violates a constitutional right. *Monell v. Dep't Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978); *see also id.* ("Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."); *Lewis v. City of West Palm Beach*, 561 F.3d 1288, 1293 (11th Cir. 2009) ("A city may only be held liable under 42 U.S.C. § 1983 when the injury caused was a result of municipal policy or custom. Municipal policy or custom may include a failure to provide adequate training if the deficiency evidences a deliberate indifference to the rights of its inhabitants." (cleaned up)). Watkins, however, has identified no Lauderhill Police Department policy or custom that *caused* the Officers to violate his rights. *See generally* SAC. To the contrary, he asserts only that the Department's *failure* to follow its own policies led to the violation. *See* Response at 2 (arguing that Count VIII "should not be construe [sic] as a failure to train but as is stated a failure to follow policy"). But the Department's *failure* to follow its own policies and procedures does not expose the city to *Monell* liability. *See City of Canton*, 489 U.S. at 389 ("It is only when the 'execution of the government's policy or custom . . . inflicts the injury' that the municipality may be held liable under § 1983."). Because Watkins has not identified any unconstitutional policy or custom—and since he hasn't explained how any such policy or custom might have *caused* the Officers to violate his rights—his *Monell* claim necessarily fails.

*Second*, even if Watkins had asserted a proper failure-to-train theory of liability, cities can only be liable under § 1983 for failing to train their officers when the "failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases[.]" *City of Canton*, 489 U.S. at 390. This, in turn, requires "a plaintiff [to] present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Gold*, 151 F.3d at 1350. A city is on notice if it either "is aware that a pattern of constitutional violations exists" or else if "if the likelihood for constitutional violation is so high that the need for training would be obvious." *Lewis*, 561 F.3d at 1293.

Watkins never suggests that the City had notice of any need to train its officers. *See generally* SAC. Nor has he alleged that the likelihood of a constitutional violation was "so high that the need for training would be obvious." Instead, he says only that the Officers "never received any kind of training regarding arrest for exposure of sexual organs." *Id.* ¶ 68. This allegation is plainly insufficient to state a viable failure-to-train claim. The City's Motion to Dismiss Count VIII is, therefore, **GRANTED**.

Watkins's claim against the Police Department is frivolous. "Sheriff's departments and police departments are not usually considered legal entities subject to suit." *Dean v. Barber*, 951 F.2d 1210, 1214 (11th Cir. 1992). The capacity to sue or be sued "shall be determined by the law of the state in which the district court is held." FED. R. CIV. P. 17(b). And, in Florida, "police departments are not legal entities amenable to suit." *Williams*, 297 F. App'x at 945 (citing *Masson v. Miami-Dade Cty.*, 738 So. 2d 431, 432 (Fla. 3d DCA 1999)); *see also Douglas v. Safie*, 2020 WL 2084849, at *1 (S.D. Fla. Apr. 30, 2020) ("The [Miami-Dade] police department does not have the capacity to be sued."). The Lauderhill Police Department is therefore **DISMISSED with prejudice** from the case.

Watkins's claim against Chief Stanley—"in her individual and official capacit[ies]," SAC ¶ 5— fares no better. "When an officer is sued under Section 1983 in his or her official capacity, the suit is

simply 'another way of pleading an action against an entity of which an officer is an agent. Such suits against municipal officers are therefore, in actuality, suits directly against the city that the officer represents." *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991). Watkins's official-capacity claim against the Chief is thus duplicative of his claim against the City—and, on that basis, must be **DISMISSED with prejudice**.

Watkins's individual-capacity claim likewise fails because "it is well established in this circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of *respondeat superior* or vicarious liability." *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999). Under § 1983, supervisory liability arises either "when the supervisor personally participates in the alleged constitutional violation" or "when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation." *Id.* One way to establish this causal connection is "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so. The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." *Id.* Alternatively, "a causal connection could also be established and supervisory liability imposed where the supervisor's improper custom or policy 'results in deliberate indifference to constitutional rights.'" *Simpson v. Stewart*, 386 F. App'x 859, 860 (11th Cir. 2010) (quoting *Hartley*, 193 F.3d at 1269).

Of course, Watkins alleges no such thing. Instead, Watkins says only that, "according to the defendant[s] Session and Vogt they never received any kind of training regarding arrest for exposure of sexual organs 800.03 and Constance Stanley has not produced any documentation or evidence that the Lauderhill police department ever informed their law enforcement officers [about the cases that narrowed the scope of § 800.03]." *Id.* ¶ 68. This, again, is plainly insufficient to state a plausible claim of relief against a police chief. Watkins, for instance, never says that Chief Stanley participated in the

alleged constitutional violations. Nor does he point to *any other* instances of improper arrests under § 800.03 that would have put Chief Stanley on notice of the need to train her officers about the (frankly) peculiar application of this statute. *See Hartley*, 193 F.3d at 1269 ("The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." (internal citations omitted)). In sum, Chief Stanley's Motion to Dismiss Count VIII is **GRANTED**.

***

This is Watkins's Second Amended Complaint. When Watkins moved to amend his First Amended Complaint, he assured the Court both that he had "concluded" his "discovery investigation" and that he wouldn't try to add any more counts or defendants. *See* Motion for Leave to Amend [ECF No. 86] at 2. When the Court granted his Motion for Leave to Amend, it warned him that "the Court will not grant him any further leave to amend." Order Granting Leave to File a Second Amended Complaint [ECF No. 90] at 2. Because Watkins is *pro se*, the Court will grant him one final chance to amend his complaint. But, since he has "concluded" his discovery—and given the assurance he gave the Court in his Motion for Leave to Amend—he will not be permitted to add new counts or defendants. He may simply take his best crack at properly alleging the counts he has already advanced against the Defendants who now remain. Of course, because Watkins will have leave to amend, the Defendants will get another chance to advance any defenses (including qualified immunity) to those counts. But Watkins is hereby forewarned that any subsequent dismissal will be *with prejudice*.

After careful review, the Court hereby **ORDERS and ADJUDGES** as follows:

1. The Defendants' Motion to Dismiss [ECF No. 92] is **DENIED without prejudice** as to Counts I, III, and V, and **GRANTED without prejudice** as to Counts II, IV, and VI–VIII— with the exception of the Lauderhill Police Department and the official-capacity claim against Chief Stanley, which are **DISMISSED with prejudice**.

2. Within 14 days of this Order, Watkins may file a third amended complaint.

   **DONE AND ORDERED** in Fort Lauderdale, Florida this 18th day of February 2021.

   _____
   **ROY K. ALTMAN**
   **UNITED STATES DISTRICT JUDGE**

cc:    counsel of record
        Eric Watkins, *pro se*