UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-60810-CIV-ALTMAN/Strauss

ERIC WATKINS,

     *Plaintiff,*

*v.*

OFFICER DAVLIN SESSION, *et al.,*

     *Defendants.*

_____/

**ORDER**

On April 3, 2015, two City of Lauderhill police officers arrested Eric Watkins and charged him with exposing his sexual organs. He says that he did no such thing and, claiming a long litany of constitutional violations, has sued the arresting officers, their police chief, and the city they work for. The Defendants have now moved to dismiss Watkins's Third Amended Complaint ("TAC") [ECF No. 188].[1] Because the two officers and their chief are entitled to qualified immunity—and since Watkins has impermissibly pled, long after the close of discovery, a new (and unviable) claim against the City—we **GRANT** the Defendants' MTD *with prejudice.*

**THE FACTS**

On the morning of April 3, 2015, the Plaintiff, Eric Watkins, drove to a City of Lauderhill park, walked over to a dumpster area, and emptied a bottle of his urine onto the ground. *See* TAC ¶ 9. Watkins never removed his penis from his clothing, nor did he actively urinate in the park or dumpster area. *Id.* ¶ 10. Watkins then enjoyed a walk through the park. *Id.* ¶ 11. From the point of his arrival and through the end of his stroll, Watkins saw "no patron, nor the defendant Session, nor his

---

[1] The Motion to Dismiss is fully briefed and ripe for adjudication. *See* Motion to Dismiss (the "MTD") [ECF No. 192]; Watkins's Response to the MTD (the "Response") [ECF No. 202]; the Defendants' Reply in Support of the MTD (the "Reply") [ECF No. 203].

car, nor anyone else, nor any other cars" in the park. *Id.* ¶ 12. It wasn't until Watkins returned to his car after his walk that he saw one of the Defendants, Officer Davlin Session, driving into the park. *Id.* ¶ 13. Between twenty and forty minutes later, Watkins saw the second Defendant, Officer William Vogt, enter the park. *Id.* ¶ 14. Between Session's arrival and Vogt's, Watkins didn't interact with Session at all. *Id.* ¶ 15.

Once in the park, Vogt approached Watkins, *id.* ¶ 14, and asked whether Watkins had urinated by the dumpster, *id.* ¶ 16. Watkins replied: "[N]o, I emptied a bottle of urine out there," pointing at the dumpster (where some high shrubs were located). *Ibid.* Vogt told Watkins that members of the public had complained to the Lauderhill Police Department about Watkins using the park's dumpster area as his toilet. *Ibid.* One such complaint, Vogt said, had come in that very morning.[2] *Ibid.* Because of those calls, Vogt explained, he'd sent an officer (presumably Session) to surveil Watkins in the park. *Ibid.* When pressed by Watkins, Vogt admitted that the calls the Police Department had received were anonymous. *Ibid.* At some point during the conversation (Watkins doesn't say when), Vogt asked Watkins why he dumped his urine out in the park instead of using a bathroom, and Watkins explained that there were no public restrooms in the park and that the administrative building (which did have a restroom) wasn't open yet. *Ibid.*

Vogt radioed for Session, who drove over from the other side of the park to join Watkins and Vogt. *Id.* ¶ 18. Session explained that he'd seen Watkins urinate in the park by the dumpster, *id.* ¶ 19— at which point Session and Vogt arrested Watkins for exposing his sexual organs, *id.* ¶ 20. Watkins told Vogt that Session wasn't in the park yet when he dumped out his urine, but Vogt ignored him. *Id.* ¶ 21. Session escorted Watkins to a police car, where Vogt, Session, and a third officer talked for

---

[2] Through discovery, Watkins learned that nobody called Vogt on April 3, 2015 (the morning of his arrest). TAC ¶ 17. At the same time, Watkins admits that a Lauderhill Police captain had, in fact, circulated an email the day before, which indicated that the department had received several complaints from the public about urination and defecation in the park. *Ibid.*

"quite some time." *Id.* ¶ 22. Eventually, Vogt drove Watkins to the Lauderhill police station—with Session and the third officer following behind. *Ibid.*[3]

Watkins maintains that the area in which he dumped out his urine "was blocked off by observation from any potential passerby/patron because the rear area was blocked by tall tree shrubs that was [sic] as tall as above my waist." *Id.* ¶ 24. In other words, "no one, assuming anyone was in the park, which they were not, could see me[.]" *Ibid.* Watkins thus alleges that his arrest was just the latest in a long-standing feud he's had with the Lauderhill Police Department. *Id.* ¶¶ 25–26. According to Watkins, "[o]ver and over," Lauderhill's police officers "would illegally trespass [him] from different properties that they had no authority to do so at." *Id.* ¶ 25. Watkins claims that, in years past, he'd repeatedly exercised his First Amendment right to lodge complaints and file lawsuits against Lauderhill's officers, *ibid.*, and he adds that Session and Vogt were among the officers who "would threaten to find a reason to arrest me if they continue to receive complaints about me singing the antigay song in the park and if I continued to file complaints and lawsuits against Lauderhill police officers," *id.* ¶ 26. Indeed, on the day of this arrest, Session "told me that he was making good on his prior threats to find a reason to arrest me." *Id.* ¶ 27.

For all these reasons, Watkins alleges that Session lied in his probable-cause affidavit, falsely claiming that he saw Watkins enter the "dumpster housing" (when he couldn't have seen any such thing), *id.* ¶ 33, and falsely averring that he observed Watkins "removing his penis from his pants, and urinating onto the ground near the dumpster" (when no such thing ever occurred), *id.* ¶ 35. Vogt likewise lied (Watkins says) by claiming that Watkins admitted to urinating in the park and by declaring that Watkins had said: "I thought I could pee there[.]" *Id.* ¶ 34.

---

[3] Neither Vogt nor Session inspected the park for urine, feces, or other evidence, and they didn't take any urine samples or photographs of the scene. TAC ¶ 23.

Watkins spent the night in jail and was released the next day. *Id.* ¶ 42. Watkins alleges that his arrest was humiliating. As he explains it, "many people walking up and down the sidewalk outside the park and people driving cars" saw the officers handcuff him and take him into custody. *Id.* ¶ 40. Watkins also says that, while he was in jail, his car was towed, and he tells us that it cost him $134.10 to retrieve it. *Id.* ¶ 39. The State Attorney's Office ultimately charged Watkins by information with violating FLA. STAT. § 800.03.[4] *Id.* ¶ 55. Watkins adds that his arrest has caused him to worry about being designated as a sex offender. *Id.* ¶ 43. Finally, Watkins insists that, from the time of his arrest until the charges were dropped, he was "refused employment from numerous businesses because of the pending sex charge. Many potential employers would tell me that their insurance policy would not allow them to hire me with such pending charges. That I needed to get it disposed of first." *Id.* ¶ 48. Ultimately, the State declined to prosecute Watkins. *Id.* ¶ 47.

In his TAC, Watkins asserts four claims against the officers: (1) false arrest/unlawful seizure (Count I); (2) malicious prosecution/fabricating evidence (Count II); (3) false imprisonment/unlawful seizure (Count III); and (4) violation of due process under the Fourteenth Amendment to the U.S. Constitution (Count IV). The TAC also advances a claim of municipal liability under 42 U.S.C. § 1983 against Lauderhill's Chief of Police, Constance Stanley, and the City of Lauderhill (Count V).

In their MTD, the Defendants urge us: (1) to dismiss Count V because it violates our First MTD Order, *see* MTD at 3–4; (2) to dismiss Count V against Chief Stanley in her *official* capacity because we've already dismissed Watkins's official-capacity claim against her *with prejudice* in our First MTD Order, *id.* at 3, 6; (3) to dismiss Count V for failure to state a municipal-liability claim, *id.* at 5–6; (4) to grant Session and Vogt qualified immunity on Counts I, II, III, and IV, because the officers had arguable probable cause to arrest Watkins, *id.* at 7–14; and (5) to dismiss Counts I, II, III, and IV,

---

[4] For more on this statute, please see our prior Order Granting in Part and Denying in Part the Motion to Dismiss (the "First MTD Order") [ECF No. 186].

4

because (a) Watkins has failed to allege that the officers either lacked probable cause or else acted with malice, *id.* at 15–17, and (b) Watkins hasn't made out a plausible due-process claim against the officers, *id.* at 17–18. After careful review, and for the reasons set out below, we **GRANT the MTD** and **DISMISS** the TAC **with prejudice**.

THE LAW

On a motion to dismiss, the Court must accept the plaintiff's factual allegations as true, construing the complaint in the light most favorable to the plaintiff. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (citing *SEC v. ESM Grp., Inc.*, 835 F.2d 270, 272 (11th Cir. 1988)). Unsupported factual allegations and legal conclusions, however, receive no such deference. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

 "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (alteration added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted). Indeed, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556). To meet this "plausibility standard," a plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (alteration added) (citing *Twombly*, 550 U.S. at 556). "The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss." *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009) (citation omitted), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012).

When, as here, the plaintiff is proceeding *pro se*, the Court must interpret the complaint liberally because *pro se* pleadings are held to "less stringent standards than those drafted by an attorney." *Sause v. Bauer*, 138 S. Ct. 2561, 2563 (2018). At the same time, the Court may not "serve as de facto counsel or [ ] rewrite an otherwise deficient pleading in order to sustain an action." *Shuler v. Ingram & Assocs.*, 441 F. App'x 712, 716 n.3 (11th Cir. 2011).

## ANALYSIS

### I.    Qualified Immunity

"Qualified immunity protects government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Priester v. City of Riviera Beach*, 208 F.3d 919, 925 (11th Cir. 2000) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In this way, the defense of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

To qualify for the immunity, a government official must show that the challenged actions were committed within the scope of his discretionary authority. *See Kingsland v. City of Miami*, 382 F.3d 1220, 1232 (11th Cir. 2004) ("To receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." (cleaned up)). If he can do so, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).

To overcome the qualified-immunity defense, a plaintiff must demonstrate that the official deprived him of a constitutional right that was "clearly established" when the alleged offense occurred. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). This requirement "ensure[s] that before they are subjected

to suit, officers are on notice their conduct is unlawful." *Id.* at 206. "Put another way, the defendant must have fair notice of his conduct's unconstitutionality which derives from one of the following sources: (1) the obvious clarity of constitutional or statutory language; (2) broad holdings or statements of principle in case law that are not tied to particularized facts; or (3) fact-specific judicial precedents that are not fairly distinguishable." *Eloy v. Guillot*, 289 F. App'x 339, 346 (11th Cir. 2008) (citing *Vinyard v. Wilson*, 311 F.3d 1340, 1350–52 (11th Cir. 2002)). For purposes of qualified immunity in this District, only decisions of the U.S. Supreme Court, the Eleventh Circuit Court of Appeals, and the Florida Supreme Court constitute "clearly established" law. *See McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007) ("We have held that decisions of the United States Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state (here, the Supreme Court of Florida) can clearly establish the law."). In sum, "[q]ualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Hope v. Pelzer*, 536 U.S. 730, 752 (2002) (cleaned up).

The Defendants assert qualified immunity as to all the claims against Session and Vogt (Counts I–IV) and the municipal-liability claim against Chief Stanley in her *individual* capacity (Count V). *See* MTD at 7–14. As we explain below, we agree that these individuals are entitled to qualified immunity and now grant their MTD.

### A.    Discretionary Function

Watkins never suggests that, when they arrested him, the officers weren't acting within the scope of their discretionary functions. *See generally* Response. He's thus forfeited any such argument. *See United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court sua sponte [only] in extraordinary circumstances."); *see also Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in

support of an issue [forfeits] it."); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented . . . are deemed [forfeited].").

Nor could he have argued otherwise. In deciding whether an act is within an officer's discretionary function, courts ask whether the act falls within the officer's general job duties. *See Hollomon ex rel. Hollomon v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004) ("Instead of focusing on whether the acts in question involved the exercise of actual discretion, we assess whether they are of a type that fell within the employee's job responsibilities."). "Our inquiry [here] is two-fold. We ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Ibid.* And, not surprisingly, the act of arresting a subject is well within the scope of a police officer's discretionary function. *See Sevostiyanova v. Cobb Cnty., Ga.*, 484 F. App'x 355, 357 (11th Cir. 2012) ("A police officer acts within his discretionary authority when he effectuates an arrest."). We'll thus agree with the Defendants that the officers (and Chief Stanley) were, at all times, acting within the scope of their discretionary functions.

### B.    Clearly Established Law

This conclusion—that the officers were engaged in a discretionary function when they arrested Watkins—shifts onto Watkins the burden of showing that the officers are *not* entitled to qualified immunity. *See Holloman*, 370 F.3d at 1264 ("If, interpreting the evidence in the light most favorable to the plaintiff, the court concludes that the defendant was engaged in a discretionary function, then the burden shifts to the plaintiff to show that the defendant is *not* entitled to qualified immunity."). To satisfy this burden, Watkins must show that the officers violated some constitutional right that was "clearly established" at the time of his arrest. *Saucier*, 533 U.S. at 201.

"[I]t is well established that an arrest without probable cause is an unreasonable seizure that violates the Fourth Amendment." *Grider v. City of Auburn*, 618 F.3d 1240, 1256 (11th Cir. 2010). An

8

officer thus enjoys qualified immunity against a false-arrest claim *only* if he had "arguable probable cause" to make the arrest. *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993) (holding that the officer was entitled to qualified immunity because he had "arguable probable cause" to arrest the plaintiff, who kept talking after being instructed to keep quiet, because that noncompliance indicated that the plaintiff "was interfering or was about to attempt to interfere" with the police). An officer has "arguable probable cause" when a "reasonable officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well-established law." *Gold v. City of Miami*, 121 F.3d 1442, 1445 (11th Cir. 1997). "The existence of arguable probable cause depends on the elements of the alleged crime and the operative fact pattern." *Longino v. Henry Cnty., Ga.*, 791 F. App'x 828, 832 (11th Cir. 2019) (cleaned up). Whether an officer had "arguable probable cause" depends on the totality of the circumstances. *Cozzi v. City of Birmingham*, 892 F.3d 1288, 1294 (11th Cir. 2018) (citing *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018)). "Arguable probable cause does not require an arresting officer to prove every element of a crime." *Scarbrough v. Myles*, 245 F.3d 1299, 1302–03 (11th Cir. 2001). Notably, "[t]he validity of an arrest does not turn on the offense announced by the officer at the time of the arrest." *Bailey v. Bd. of Cnty. Comm'rs*, 956 F.2d 1112, 1119 n.4 (11th Cir. 1992). And "[a]n 'officer's underlying intent or motivation' is irrelevant" to the "arguable probable cause" analysis. *Longino*, 791 F. App'x at 832 (quoting *Lee*, 284 F.3d at 1195).

In arguing that they had arguable probable cause to arrest Watkins, the Defendants proceed along three fronts. *First*, they say that "arguable probable cause clearly existed to arrest Plaintiff for indecent exposure, pursuant to Section 800.03, Fla. Stat., even if the inference of a sexual or lascivious intent was a mistake of fact." MTD at 9. *Second*, "even viewing the facts in the light most favorable to Plaintiff," they argue that "it is clear that the Officers (and to the extent alleged, Chief Stanley), made a reasonable mistake of law, to the extent the Court determines that lascivious intent may not be

inferred from the face of the Complaint." *Id.* at 10–11. *Third*, they insist that "the Officers are entitled to qualified immunity as long as Plaintiff's arrest was supported by arguable probable cause for <u>any</u> offense, not only the crime announced at the time[.]" *Id.* at 13. As to this last argument, the Defendants explain that, "even assuming Plaintiff's story that he did not physically urinate in public, but simply poured a bottle of expressed urine onto the ground (TAC, ¶ 9), there was still at least arguable probable cause for *other* crimes, including breach of the peace, pursuant to § 877.03, Fla. Stat., and/or creating a public nuisance under § 823.01, Fla. Stat." *Ibid.* Because we agree with this third point, we'll skip the first two.

Session and Vogt are entitled to qualified immunity because they had arguable probable cause to arrest Watkins for *some* crime—even if it wasn't for indecent exposure under § 800.03. So too for Watkins's individual-capacity claim against Chief Stanley: Even if Watkins *has* alleged a viable cause of action against her for ratifying the arrest, she'd be entitled to qualified immunity because her officers had arguable probable cause to arrest him. "Probable cause for an arrest may be found if there is probable cause to believe *any* crime was committed, whether or not there is probable cause for the crime the arresting officer actually believed had been committed." *Manners v. Cannella*, 891 F.3d 959, 969 (11th Cir. 2018) (emphasis added). "The validity of an arrest does not turn on the offense announced by the officer at the time of the arrest." *Bailey*, 956 F.2d at 1119 n.4. "Indeed, when an officer makes an arrest, which is properly supported by probable cause to arrest for a *certain* offense, neither his subjective reliance on an offense for which no probable cause exists nor his verbal announcement of the wrong offense vitiates the arrest." *Lee*, 284 F.3d at 1196 (emphasis added & cleaned up); *see also United States v. Saunders*, 476 F.2d 5, 7–8 (5th Cir. 1973) ("Since the BNDD agents had probable cause to arrest appellant for marijuana possession, the arrest and the incident search

were valid, and the agents' reliance on the harboring or concealing charge did not affect this result.").[5]

The Defendants have identified two crimes that (in their view) they had "arguable probable cause" to believe Watkins had committed: breach of the peace under FLA. STAT. § 877.03; and public nuisance under FLA. STAT. § 823.01. *See* MTD at 13. In trying to understand the scenario the officers faced when they arrested Watkins, we constrain ourselves to the factual allegations of Watkins's complaint. There, Watkins alleges that he "walked over to the dumpster housing area at its rear on the outside—not the inside of the dumpster housing and dumped [his] urine from a bottle onto the ground[.]" TAC ¶ 9. He adds that, when Officer Vogt asked him whether he'd urinated by the dumpster, he "told him no I emptied a bottle of urine out there[.]" *Id.* ¶ 16. In other words, Watkins admitted, before he was arrested, that he'd just dumped out a bottle of his own urine in a public park. Our question, then, is whether, based on this admission, Session and Vogt had arguable probable cause to believe that Watkins had violated *either* FLA. STAT. § 877.03 *or* FLA. STAT. § 823.01. We think that they did.

The former statute provides as follows:

> Breach of the peace; disorderly conduct.—Whoever commits such acts as are of a nature to corrupt the public morals, or outrage the sense of public decency, or affect the peace and quiet of persons who may witness them, or engages in brawling or fighting, or engages in such conduct as to constitute a breach of the peace or disorderly conduct, shall be guilty of a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083.

§ 877.03. The latter says:

> Nuisances; penalty.—All nuisances that tend to annoy the community, injure the health of the citizens in general, or corrupt the public morals are misdemeanors of the second degree, punishable as provided in s. 775.083, except that a violation of s. 823.10 is a felony of the third degree.

---

[5] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

§ 823.01.

We'll start with the obvious: Both statutes sweep *broadly*. And, when we drill down (as best we can) on what *exactly* these statutes are proscribing, we think a *reasonable* officer in Session's or Vogt's shoes *could* have believed that Watkins had violated the law. Take, for instance, § 877.03, which criminalizes "such acts as are of a nature" to (1) "corrupt the public morals," or (2) "outrage the sense of public decency," or (3) "affect the peace and quiet of persons who may witness them[.]" Beginning with the prelude, we think it significant that the law doesn't prohibit only acts that *in fact* corrupt, outrage, or affect—but only "such acts as are of a nature" to corrupt, outrage, etc. The phrase "of a nature" indicates, not a specific thing (or act) in itself, but the "kind, order, or general character" of the thing (or act)—as in "island songs of a Hawaiian nature." *Nature*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1508 (1961).[6] A song can still be "of a Hawaiian nature," even if it isn't *actually* from Hawaii. Along these same lines, the Oxford English Dictionary defines "of . . . (a certain) nature" as "of a (also the) type, character, etc., specified" and analogizes the phrase to the "sense" of something. *Nature*, p1, OXFORD ENGLISH DICTIONARY ONLINE, https://www.oed.com/view/Entry/125353 (last visited Nov. 7, 2022).[7]

---

[6] We use *this* dictionary, which was printed in 1961, because it tells us a great deal about what these words meant, in common usage, when the disorderly-conduct statute was first promulgated in 1959. *See* FLA. STAT. § 877.03 (West) (noting the statute's origin in Laws 1959, c. 59-32, § 1); *see also, e.g., Perrin v. United States*, 444 U.S. 37, 42 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning."); *Price v. Time, Inc.*, 416 F.3d 1327, 1338 (11th Cir. 2005) ("[W]e have checked dictionaries in existence at the time the statute was enacted in 1935 to see if there has been any change in the meaning of 'newspaper' since then."); A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 69 (2012) ("The ordinary-meaning rule is the most fundamental semantic rule of interpretation. . . . Most common English words have a number of dictionary definitions, some of them quite abstruse and rarely intended. One should assume the contextually appropriate ordinary meaning unless there is reason to think otherwise.").

[7] Further buttressing our view of the general character of this phrase, the OED here defines the "sense" of something as "[t]he inherent or essential quality or constitution of a thing"—*not* the thing itself. *Sense*, n8, OXFORD, https://www.oed.com/view/Entry/125353 (last visited Nov. 7, 2022).

In describing this *sense*, the OED deploys several usage examples—including this one by George Kennan in 1961: "They themselves, in fact, had independently suggested something *of this nature*." *Ibid.* (quoting George Kennan, RUSSIA AND THE WEST UNDER LENIN AND STALIN 212 (Mentor, 1st ed. 1961) (emphasis added)). The sentence is referring to England's[8] idea for holding a European conference in Genoa in April 1922, at which the major stakeholders—*i.e.*, Russia, Germany, England, and France—would discuss (among other things) a proposal to include Russia in Europe's reconstruction efforts. *See* RUSSIA AND THE WEST 212. And the Russians, Kennan tells us, also "suggested something *of this nature*." Again, the Russians hadn't suggested *exactly* the same terms England had proposed; they'd only proposed "something of this nature"—*i.e.*, something in the general character (we might even say ballpark) of what the Brits had outlined. So, too, with this sentence from Orwell in 1949, which highlights the point expressly: "And yet, though you could not actually hear what the man was saying, you could not be in any doubt about its general nature." *Nature*, p1, OXFORD (citing George Orwell, NINETEEN EIGHTY-FOUR: A NOVEL 56 (Secker & Warburg, 1st ed. 1949)). As Orwell made pellucid, that you couldn't *actually hear* the thing the man was saying didn't prevent you from comprehending its *nature*. Acts, in short, that are "of the nature" of a thing necessarily represent a broader category of things than the thing (or act) in itself.

But what does this all mean for Watkins? Simply speaking, it means this: that, to be illegal under § 877.03, an act (here, dumping out one's urine in a public park) doesn't *actually* have to corrupt, outrage, etc. It only needs to be of the general character (or type) of things that tend to corrupt, outrage, affect. Remember, too, our standard: An officer has "arguable probable cause" when a "reasonable officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well-established

---

[8] (through its prime minister, David Lloyd George).

law." *Gold*, 121 F.3d at 1445. So, *could* a reasonable officer have believed that the act of dumping out one's urine in a public park was the kind of thing that would (1) "corrupt the public morals," or (2) "outrage the sense of public decency," or (3) "affect the peace and quiet of persons who may witness them[?]"

In answering this question, we'll focus chiefly on the second clause—which yields, to our view, a particularly clear answer. Webster's defines "[d]ecency" as, among other things, "conformity to standards of taste, propriety, or quality"—or, put more directly, "whatever is proper or becoming[.]" *Decency*, WEBSTER'S at 584. Something is "proper" if it is "socially appropriate" and "marked by rightness, correctness, or rectitude." *Id.* at 1818. And a thing (or act) is in keeping with "propriety" when it meets "the standard of what is socially acceptable in conduct, behavior, speech[.]" *Id.* at 1819. To close the loop on this clause, Webster's gives us one synonym for the transitive verb "outrage": to "offend." *Id.* at 1603.[9] And, as relevant here, to offend can mean to "hurt" or "injure"—as in "tasteless billboards that offend the eye[.]" *Id.* at 1566. We think that a reasonable officer, knowing what Session and Vogt knew, *could* have believed that Watkins's act of dumping his own urine in a public park was precisely the kind of thing that would, like a tasteless billboard, "offend" (or outrage) "the standard of what is socially acceptable in conduct, behavior, speech"—*i.e.*, that such an officer may well have thought that Watkins's behavior *wasn't* "socially appropriate" or "marked by rightness, correctness, or rectitude."

Recall, in this respect, that whether an officer had "arguable probable cause" depends on the

---

[9] Webster's also says that "outrage" means "to cause a feeling of anger or violent resentment in"—as in someone who's "outraged by the whole way in which this matter has been handled[.]" WEBSTER'S at 1603. We think this definition supports the officers here, too, because it seems reasonable to believe that someone might be "outraged"—that is, angered—by the thought of someone else dumping their own urine in a park that's meant for recreation and public use. But, giving Watkins the benefit of the doubt, we won't harp on this definition because it seems strange—and out of place—to say that Watkins caused a feeling of anger in "the sense of public decency."

totality of the circumstances. *Cozzi*, 892 F.3d at 1294 (citing *Wesby*, 138 S. Ct. at 586). And remember that, according to the TAC, a police captain in Session and Vogt's own department had, just the day before Watkins's arrest, circulated an email, describing *several* complaints the department had received from *the public* about someone urinating and defecating in the *very same* park Watkins was later found in. Given these complaints—and a native speaker's general understanding of the English language—a reasonable officer in Session's or Vogt's shoes could've believed that dumping one's urine out in a public park is the sort of "act[ ] as [is] of a nature to . . . outrage the sense of public decency[.]"

We come out the same way with respect to § 823.01, which proscribes (in a similarly broad way) "all nuisances *that tend to* annoy the community, injure the health of the citizens in general, or corrupt the public morals[.]" (emphasis added). We think it plain, first of all, that the act of dumping one's urine out in a public park constitutes a nuisance. A nuisance is any "condition, activity, or situation . . . that interferes with the use or enjoyment of property." *Nuisance*, BLACK'S LAW DICTIONARY (11th ed. 2019). We don't think it's a stretch for an officer—faced with complaints of public urination in this same park—to suppose that scattering one's own urine in the park "interferes with the use or enjoyment of" that park. But what was this nuisance *tending* towards? When "tend" is used as an intransitive verb—as is it here—it means to "have an inclination to a particular quality, aspect, or state." *Tend*, MERRIAM-WEBSTER UNABRIDGED, https://unabridged.merriam-webster.com/unabridged/tend (last visited Nov. 7, 2022). Consider, for instance, the following sentence: "Children tend to enjoy happy music." Of course, this doesn't mean that *all* children will *always* enjoy happy music—only that, when presented with happy music, children "have an inclination" toward happiness, enjoyment, etc. So, too, here: We think it reasonable for an officer to conclude that the particular nuisance Watkins admittedly engaged in would—as the statute proscribes—"tend to

annoy the community."[10] That, again, doesn't mean that it *will* in fact annoy the community—only that it's the kind of nuisance that *tends* to. Indeed, as the TAC acknowledges, members of the community had apparently expressed their annoyance by calling the police department to complain about the very thing Watkins then admitted to doing.[11]

Watkins (notably) has cited no case—nor have we found any—for his view that the act of dumping one's urine out in a public park *doesn't* constitute a breach of the peace under § 877.03 or a public nuisance within the meaning of § 823.01. And it was indisputably *his* burden to show that his arrest violated some constitutional right that was "clearly established." To put a finer point on it, since it isn't at all clear, in these circumstances, that the officers *couldn't* arrest Watkins for breaching the peace (or for engaging in public nuisance), the officers had arguable probable cause to arrest him. And, armed as they were with arguable probable cause, the officers are entitled to qualified immunity—even though they cited a different statute when they took him into custody. *See Bailey*, 956 F.2d at 1119 n.4. ("The validity of an arrest does not turn on the offense announced by the officer at the time of the arrest."); *see also Lee*, 284 F.3d at 1196 ("Indeed, when an officer makes an arrest, which is properly supported by probable cause to arrest for a certain offense, neither his subjective reliance on an offense for which no probable cause exists nor his verbal announcement of the wrong offense vitiates the arrest." (cleaned up)). It follows, too, that Chief Stanley—who's alleged in Count V to have done nothing more than ratify Watkins's arrest, *see* TAC ¶¶ 64, 66—is likewise entitled to qualified

---

[10] And we don't agree with Watkins that the answer to this question turns on *how many* times he disposed of his urine in a public place. *See* Response at 16 ("[T]he mere one time dumping of urine from a bottle onto the ground and in the secluded area where plaintiff dumped the urine can in no way violate Section 877.03 or Section 823.01[.]"). On the contrary, as we've suggested, we think a reasonable officer could conclude that even the one-time dumping of one's urine in a public park is the kind of nuisance that *tends* to "annoy the community."

[11] And the proposition is (unsurprisingly) long-settled in Florida that, when "human feces and urine are deposited on the public streets or public highway in said town," it is "to the great scandal and injury of said town and the inhabitants thereof." *Fla. Cent. & P.R. Co. v. State*, 13 So. 103, 104 (Fla. 1893).

immunity (at least with respect to the individual-capacity claim against her).

We therefore **GRANT** this portion of the MTD and **DISMISS with prejudice** Counts I, II, III, and IV against Session and Vogt and Count V against Chief Stanley in her *individual* capacity.[12]

## II.     The *Monell* Claim

In Count V, Watkins alleges that Chief Stanley[13] (in both her individual and official capacities) and the City of Lauderhill "are liable for defendants Session and Vogt's violation of plaintiff's constitutional rights stated under Counts 1–4, because the City of Lauderhill authorized Constance Stanley – Chief of Police – its final policy maker over all arrest [sic] for criminal offenses and the City of Lauderhill and Chief of Police Constance Stanley erroneously approved the defendants Vogt and Session's probable cause findings to arrest plaintiff." TAC ¶ 64. Specifically, Watkins says: "Pursuant to City of Lauderhill ordinance Sec. [illegible] the City of Lauderhill made Constance Stanley final policymaker over all criminal arrest made at the discretion of the Lauderhill police officers." *Id.* ¶ 65. According to Watkins: "As final policy maker, Stanley had the authority to approve or disapprove Session's and Vogt's arrest of Plaintiff. She approved Session's and Vogt's arrest of plaintiff." *Id.* ¶ 66. Watkins maintains that Chief "Stanley's approval of the officers' arrest was erroneous because . . . it had been clearly established law that § 800.03 necessarily prohibits only lewd and lascivious conduct."

---

[12] Because the Defendants are entitled to qualified immunity, we needn't reach the merits of these claims. *See Camreta v. Greene*, 563 U.S. 692, 705 (2011) (noting that, when a court dismisses a claim because of qualified immunity, "[t]he court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, has merit. And indeed, our usual adjudicatory rules suggest that a court *should* forbear resolving [the merits of the claim]. After all, a longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." (cleaned up)); *cf. Lenz v. Winburn*, 51 F.3d 1540, 1547 (11th Cir. 1995) ("Because Paskewitz acted outside the scope of her authority, she is not entitled to qualified immunity. We therefore must reach the merits of the Lenzes' Fourth and Fourteenth Amendment claims against her." (cleaned up)).

[13] We recognize that we just dismissed Count V as to Chief Stanley in her *individual* capacity. We add here only that this claim would've failed anyway—and for reasons having nothing to do with qualified immunity.

*Id.* ¶¶ 67–68. Watkins also alleges that, had Chief Stanley overturned his arrest, the "plaintiff would have been immediately release [sic] from the custody of Lauderhill police department and no original proceedings would have ever commence [sic]." *Id.* ¶ 69. We now dismiss Count V *with prejudice* for two reasons.

*First*, we've already dismissed *with prejudice* Watkins's claim against Chief Stanley in her *official* capacity. *See* First MTD Order at 23–24 ("'When an officer is sued under Section 1983 in his or her official capacity, the suit is simply another way of pleading an action against an entity of which an officer is an agent. Such suits against municipal officers are therefore, in actuality, suits directly against the city that the officer represents.' *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991). Watkins's official-capacity claim against the Chief is thus duplicative of his claim against the City—and, on that basis, must be **DISMISSED with prejudice**."). Watkins concedes that "the Court did restrict plaintiff from restating an official capacity claim against the Chief," but he refiled the claim anyway because he "conscientiously believes that he did the right thing in also charging Stanley in her official capacity as well." Response at 2. That's not how this works. We now reiterate that Watkins's claim against Chief Stanley in her *official* capacity is **DISMISSED with prejudice**.[14]

*Second*, Watkins now raises an entirely new theory of liability in Count V. That's a problem because we've already warned Watkins that, "since he has 'concluded' his discovery—and given the assurance he gave the Court in his Motion for Leave to Amend—he will not be permitted to add new counts or defendants. He may simply take his best crack at properly alleging the counts he has already advanced against the Defendants who now remain." First MTD Order at 25. In the previous iterations of his complaint, Watkins's claim against the City and Chief Stanley was rooted in a failure-to-train theory. *See, e.g.*, Second Amended Complaint ("SAC") [ECF No. 91] ¶ 61 ("[T]he police department

---

[14] Since we've already dismissed (on qualified-immunity grounds) Watkins's individual-capacity claim against Chief Stanley, this ruling disposes of the entirety of his claim against her.

must periodically issue memorandums or court decisions which affects [sic] the officer's conduct in arrest situations."); *id.* ¶ 66 ("[T]he Lauderhill Police Department, Constance Stanley, and the City of Lauderhill was [sic] required to inform its officers of the holdings and decisions in those cases [referring to *Hoffman*, *Chesebrough*, and *Payne*.]"); *id.* ¶ 67 (alleging that, had the officers been so trained, the defendants "would have never violate [sic] plaintiff's constitutional rights"). So, while he's right that he'd previously asserted a "claim against defendant City of Lauderhill and Chief of Police Stanley pursuant to *Monell*," Response at 2, the kind of *Monell* claim he advances now is totally different from the one he offered before.

For one thing, his new final-policymaker claim requires proof of different elements—and is subject to different defenses—than the old failure-to-train claim he now appears to have abandoned. *Compare Connick v. Thompson*, 563 U.S. 51, 61 (2011) ("To satisfy the statute [§ 1983], a municipality's failure to train its employees in a relevant respect must amount to deliberate indifference to the rights of persons with whom the untrained employees come into contact." (cleaned up)), *and ibid.* ("Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." (cleaned up)), *with Grech v. Clayton Cnty., Ga.*, 335 F.3d 1326, 1330 (11th Cir. 2003) (noting that, to state a final-policymaker claim, "a plaintiff (1) must show that the local government entity, here the county, has authority and responsibility over the governmental function in issue and (2) must identify those officials who speak with final policymaking authority for that local governmental entity concerning the act alleged to have caused the particular constitutional violation in issue").

For another, there's a whole series of factual points Watkins would need to develop to sustain his final-policymaker claim—including questions about *how* the Lauderhill Police Department

operates, *whether* Chief Stanley is typically involved in "ratifying" low-level arrests like this one,[15] *whether* Chief Stanley *in fact* approved of *this* arrest, and (if she did) *when* exactly her approval was sought and obtained. This last question, of course, bears some significance in a case like ours, where Watkins was released from jail the day after he was arrested, which would mean that, for the unlawful-detention portion of Count V to have any merit at all, he would have to show that the officers ran their arrest request—if such a thing is even required (*q.v.* our discussion in note 15)—all the way up the flagpole, such that Chief Stanley was able to review it (and approve it) *before* he was released.[16]

This new claim would thus require the parties to take *a great deal of* additional discovery— something Watkins already assured us he *wouldn't* need, *see* Motion for Leave to Amend [ECF No. 86] at 2 (Watkins informing us that he'd "concluded" his "discovery investigation"), and which we wouldn't have allowed in any case, principally because discovery closed *more than two years* ago, *see* Amended Order Setting Trial [ECF No. 97] at 1 (closing discovery on August 10, 2020). So, while Watkins *could* have re-pled his failure-to-train claim against the City and Chief Stanley, he wasn't permitted to do what he's done in Count V here—*viz.*, plead an entirely new kind of *Monell* claim years

---

[15] Without for a moment offering any findings on this question, we note that the idea of a police department requiring (or even permitting) its chief to "ratify" *every single* arrest—including, as relevant here, all *misdemeanor* arrests—is as implausible as it would be unworkable. We've never heard of a police department engaging in so inefficient a practice, and we can't imagine that the Lauderhill Police Department has elected to saddle its police chief—who should be meeting with the City's elected officials, implementing a vision for the whole department, and supervising the higher-level managers—with direct responsibility for the lower-level work of its road-patrol officers. Nevertheless, as we explain above the line, we don't need to reach this merits question here—principally because Watkins has completely ignored our First MTD Order's unambiguous instruction that he refrain from advancing *new* claims.

[16] In Count V, Watkins alleges that the City and the Chief "are liable for defendants Session and Vogt's violation of plaintiff's constitutional rights stated under Counts 1–4[.]" TAC ¶ 64. In Count III, Watkins avers that he was unlawfully detained. Taking these two together, Watkins asserts in Count V that, had Chief Stanley overturned his arrest, he "would have been immediately release [sic] from the custody of Lauderhill police department and no original proceedings would have ever commence [sic]." *Id.* ¶ 69. Our point above the line, then, is that, if Chief Stanley didn't get around to "ratifying" Watkins's arrest until *after* he was released, then she couldn't be responsible for any part of his already-completed detention.

after the close of discovery. *See Johnson v. Bd. of Regents of Univ. of Ga.*, 263 F.3d 1234, 1269 (11th Cir. 2001) (noting that the Eleventh Circuit "accord[s] district courts broad discretion over the management of pre-trial activities, including discovery and scheduling"); *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1366 (11th Cir. 1997) ("[D]istrict courts enjoy broad discretion in deciding how best to manage the cases before them[.]"); *United States v. McCutcheon*, 86 F.3d 187, 190 (11th Cir. 1996) (noting the "broad discretion which is allowed a trial court to manage its own docket"). Watkins, in sum, failed to heed our unambiguous instruction that he stick to the claims he'd already brought, and the Eleventh Circuit has been quite clear that we "may dismiss a claim if the plaintiff fails . . . [to] comply with a court order." *Equity Lifestyle Props., Inc., v. Fla. Mowing & Landscaping Serv., Inc.*, 556 F.3d 1232, 1240 (11th Cir. 2009) (citation omitted).

We therefore **DISMISS with prejudice** Count V as to both the City of Lauderhill and Chief Stanley (in both her individual and official capacities).

## CONCLUSION

This is Watkins's Third Amended Complaint. When we dismissed his Second Amended Complaint, we cautioned him that "any subsequent dismissal will be *with prejudice*." First MTD Order at 25 (emphasis in original). And that's, of course, where we are now—dismissing (again) a complaint that, at least as to the individual Defendants, appears to have no chance of success. *See, e.g., Cockrell v. Sparks*, 510 F.3d 1307, 1310 (11th Cir. 2007) ("Leave to amend a complaint is futile when the complaint as amended would still be properly dismissed or be immediately subject to summary judgment for the defendant."). In circumstances like these—where any further emendation would be futile—courts in our Circuit routinely dismiss complaints with prejudice. *See, e.g., Philippeaux v. City of Coral Springs*, 2020 WL 2846531, at *5 (S.D. Fla. June 2, 2020) (Altman, J.) ("For two reasons, the Court refuses to give Philippeaux a *fifth* bite at the apple here. . . . Philippeaux has repeatedly failed to cure his complaint's deficiencies . . . . Philippeaux has yet to allege any City policy or custom that

would plausibly expose it to liability under § 1983. Dismissal—without *yet another* opportunity to amend—is therefore proper.").

And, as to the new *Monell* claim Watkins has asserted against the City and the Chief in her official capacity, we think that allowing Watkins to amend *again* "at this *very* late stage in the case—long after discovery has been completed . . . would cause extreme and undue prejudice to the Defendants." *Rebalko v. City of Coral Springs*, 552 F. Supp. 3d 1285, 1334 (S.D. Fla. Nov. 3, 2020) (Altman, J.).

***

After careful review, therefore, we **ORDER and ADJUDGE** as follows:

1. The Defendants' Motion to Dismiss [ECF No. 192] is **GRANTED**.

2. The Third Amended Complaint [ECF No. 188] is **DISMISSED with prejudice**.

3. This case shall remain **CLOSED**. All pending deadlines and hearings are **TERMINATED**, and any pending motions are **DENIED as moot**.

**DONE AND ORDERED** in the Southern District of Florida on November 3, 2022.

_____

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record
        Eric Watkins, *pro se*